UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CINEMA VILLAGE CINEMART, INC., <br><br> Plaintiff, <br><br> vs. <br><br> REGAL ENTERTAINMENT GROUP and Does 2 through 50, inclusive, <br><br> Defendant. | |

**COMPLAINT FOR: (1) VIOLATION OF THE SHERMAN ACT, 15 U.S.C. § 1; (2) VIOLATION OF THE DONNELLEY ACT, SECTIONS 340-370 OF NEW YORK GENERAL BUSINESS LAW; AND (3) INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE;
DEMAND FOR JURY TRIAL**

Plaintiff files this complaint against the above-named defendant and, demanding trial by jury, complains and alleges as follows:

## NATURE OF THE ACTION

1. Plaintiff Cinema Village Cinemart, Inc. ("CVC") operates the Cinemart Cinema ("Cinemart") which is located at 106-03 Metropolitan Ave., Forest Hills, NY 11375. Cinemart brings this action to obtain compensatory damages, punitive damages, a permanent injunction, and other supplemental and ancillary relief for Regal Entertainment Group's ("Regal") antitrust violations, unfair competition, and tortious interference in connection with the licensing of first-run, feature-length, motion picture films for exhibition to the public in theaters in the Forest Hills, New York market. Regal has used the immense buying power of its theater circuit arising from the large number of its theaters and screens in numerous markets in the United States— including many monopoly markets where it operates the only theater—to combine with and coerce film distributors to deprive Cinemart of fair competitive access to films. This illegal conduct has deprived the public of legitimate choice with respect to the theaters in which they are able to see films, severely damaged competition in licensing of films, has damaged

Cinemart's business and property, and is likely to continue unless permanently enjoined by the Court.

## JURISDICTION AND VENUE

2. CVC brings this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, for treble damages, injunctive relief, cost of suit and reasonable attorneys' fees against defendant for injuries sustained by Plaintiff by reason of Defendant's violation of § 1 of the Sherman Act 15 U.S.C. § 1 and sections 340-370 of New York General Business Law on the Donnelly Act. CVC also alleges a claim for the tort of intentional interference with prospective economic advantage.

3. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a) because the amount in controversy exceeds the sum or value of $75,000 and the dispute is between citizens of different states.

4. Venue is proper in this judicial district under 28 U.S.C. § 1391 because Regal transacts business on a systematic and continuous basis within this District, and the unlawful acts alleged herein were performed and occurred in material part within this District.

## PARTIES

5. Plaintiff CVC is a corporation organized and existing under the laws of the State of New York and qualified to transact business in New York with its principal place of business in New York, New York. The Cinemart is not in substantial competition with Regal in Forest Hills. The Cinemart is a 5-screen complex located at 106-03 Metropolitan Ave., Forest Hills, New York.

6. Defendant Regal is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Knoxville, Tennessee. Regal is the result of the consolidation of Regal Cinemas, Edwards Theatres, and United Artists Theatres. Regal operates motion picture theaters at various locations in New York, and elsewhere in the United States. Regal is the largest and most geographically diverse theater circuit in the United States with approximately 7,631 screens in 575 theaters in various locations, including the Regal

Midway Stadium 9 Theater ("Midway") in Queens, New York.  Regal has substantial "circuit power" as measured by its market shares in major Defined Market Areas throughout the United States.

7.     CVC does not presently have knowledge of the true names and capacities of Defendants sued herein as Does 2 through 50, inclusive, and therefore sues said Defendants by such fictitious names.  CVC will amend this Complaint to allege the true names and capacities of such fictitiously named Defendants when the same have been ascertained.  CVC is informed and believes, and on that basis alleges, that each of the fictitiously named Defendants is responsible in some manner for the occurrences, acts and omissions alleged herein, and that CVC's damages were proximately caused by their conduct.

## DEFINITIONS AND INDUSTRY STRUCTURE

8.     "Exhibitors" are persons or companies that operate one or more motion picture theaters in which films are exhibited or shown to the public.  Many theaters have multiple screens, each of which is located in its own auditorium, thereby allowing more than one film to be exhibited in the theater at the same time.  Such theaters are known as multiplexes, megaplexes, or theater complexes.

9.     "Distributors" are companies that arrange for the marketing, promotion, and licensing of films for exhibition to the public in theaters throughout the United States and elsewhere.  The distribution level of the film industry is highly concentrated, with film distribution rights for films generating the vast majority of box office revenues being controlled by a small number of distributors, including The Walt Disney Company, Twentieth Century Fox Film Corporation, Warner Bros. Entertainment Inc., Lions Gate Entertainment Corporation, Paramount Pictures Corporation, Universal Studios, Inc., and Does 1 through 50.

10.    "Film" or "films" means feature-length, motion-picture films that run for more than sixty minutes.

11.    "First run," when used in connection with films or films, means the number of weeks following the release date of a film for which an exhibitor has licensed a new film.

"Blockbuster" hits aside, a modern film's theatrical exhibition life generally is no more than a few weeks. After these first weeks, the film is released in other entertainment formats such as on-demand internet streaming, Blu-Ray Disc, DVD, and pay-per-view television. For this reason, a film's first run is typically its only theatrical run, with an exception for a limited number of films that will be licensed for a second run or sub run in certain markets at discounted admission prices. An exhibitor, such as plaintiff, who cannot obtain license rights to a film for first-run films likely will never have access to the film, or will have access to it only after its theatrical exhibition value has been virtually exhausted.

12. Before a film is released, distributors engage in extensive research, audience tracking, and sophisticated modeling to estimate its likely range of revenues in order to, among other things, determine promotional and advertising budgets. Thus, well before a film is licensed to exhibitors, distributors have a well-informed expectation and estimation as to its likely revenues.

13. Distributors refer to "zones" in connection with film licensing. Zones are geographic or trade areas in a city or other area of significant population. Some film zones are "non-competitive" or "monopoly" zones—that is, the zone has only one theater and no competition. Other film zones are "competitive"—that is, the zone has more than one theater.

14. A "clearance" is an exclusivity agreement between a favored exhibitor and a distributor under which the distributor agrees that it will not license a film to play or run at the same time with any other theater in a zone. Clearances may be express or implied. In the past, the primary justification for clearances was the expectation that the licensed exhibitor would pay for extra promotion or advertising in its market.

15. In contrast, in recent years, most distributors have adopted a "wide release" strategy for the majority of their first-run films. Under this strategy, film distributors try to earn as much revenue as possible in the first several weeks after a release by showing the film on as many screens and in as many theaters as possible. Release date "screen count"—the number of

screens on which a film is exhibited on the date of its release—has become an important measure of a film's success from the distributors' perspectives.

16. "Circuit dealing" is an unlawful tactic (*United States v. Griffith*, 334 U.S. 100 (1948).) where a large exhibitor that can offer a substantial number of screens "pools" its purchasing power in order to bid for films. Circuit dealing has been repeatedly condemned for undermining the competitive process of bidding for film licenses on a theater-by-theater and film-by-film basis. Dominant exhibitor circuits like Regal derive substantial unfair market power from their ability to provide numerous exhibition locations or runs simultaneously to distributors for the wide release of a film during its first run, including locations in monopoly zones where a distributor has no other alternative exhibitor to play a film.

## THE THEATERS

17. The Midway Theater is located at 108-22 Queens Blvd., Forest Hills, New York. The Midway is an upscale, 9 screen stadium-style multiplex theater that exhibits a wide variety of first-run films to its customers.

18. The Cinemart and the Midway are not in substantial competition. A clearance over a theatre with which the clearing theater is not in substantial competition is an unlawful restraint of trade. (*J.S. Theatres v. Twentieth Century* Fox, 212 F.2d 840 (2nd Cir. 1954).)

19. The Cinemart has 5 screens with a total of 816 seats and only recently began presenting films in a digital format with Dolby Digital CP 500 Sound. The Cinemart is not a stadium-style seating arrangement like the Midway. Rather, it has a slightly graded slope style seating which is more accessible for senior citizens. The Cinemart added a café in a building adjacent to the theater, where patrons can enjoy food, wine and refreshments before or after the movie. Further, the prices at the Cinemart are substantially less than charged at the Midway: $9.00 vs. $14.25 for adults and $6.00 vs. $10.75 for children. Regal charges $4.00 extra for 3D. Cinemart charges $2.00 extra for 3D. Cinemart gives free popcorn for every ticket sold and reduced rates on all of its concessions. Despite these cosmetic differences, the Cinemart is

comparable to the Midway because of its proven ability to deliver top ticket revenues or "grosses" on the first-run films when such films are licensed for play in Cinemart's theater.

## RELEVANT MARKET

**Geographic Market**

20. The relevant geographic market for purposes of the antitrust claims here is Forest Hills, New York—where the Cinemart and the Midway Theater operate.

21. Forest Hills is an affluent neighborhood located in the New York City borough of Queens. The main thoroughfare is Queens Boulevard, which is very wide. Metropolitan Avenue is known for its antique shops. Forest Hills is easily accessible by subway, rail, bus and car. The commercial heart of Forest Hills is a mile-long stretch of Austin Street between Yellowstone Boulevard and Ascan Avenue. It is not reasonably practicable for the overwhelming majority of Queens residents to leave Queens to see movies on a regular basis, even if prices in Queens increased significantly. In short, Forest Hills consumers turn to theaters in Forest Hills to see first-run films. Moreover, residents from other cities or municipalities do not often come to Queens to see films.

**Product Market**

22. The relevant product market consists of the market for licensing of first-run films in the relevant geographic market. Consumers, distributors, and exhibitors consider first-run films a unique product that is not reasonably interchangeable with other films or other forms of entertainment. Distributors and exhibitors, such as Cinemart and Regal, treat first-run films different from other films. These first-run films command higher prices and are in far higher demand for exhibition in theaters than other films. Even if the price of first-run films increased, or output of first-run films was reduced, most consumers would still see first-run films rather than other films. Therefore, the cross elasticity of demand between first-run films and other films is low. New York and federal courts have recognized and have affirmed product markets of first-run films.

**REGAL DEMANDS AND OBTAINS CLEARANCES**

23.     Beginning within four years prior to the commencement of this action, Regal began receiving exclusive licenses for the vast majority of first-run films in the relevant market. For example, when Cinemart attempted to license blockbuster first-run films from Warner Bros., a Warner Bros. representative informed Cinemart's booking consultant Arthur Marblestone that the Cinemart would be playing all of their first run films day and date with the Midway from January 1, 2015 forward.

24.     As a result, the Cinemart was able to show the movie "American Sniper" as a first-run film and grossed very high numbers. However, in an apparent act of protest, the Midway refused to play day and date with the Cinemart on the American Sniper film. Thereafter and in furtherance of their agreement with Warner Bros., on February 2, 2015 Mr. Marblestone called Warner Bros. to confirm the next first run film "Jupiter Ascenting" opening February 6, 2015. Warner Bros. then backed off of their previous commitment to allow the Cinemart to play all first run films with Midway day and date. Mr. Marblestone was informed that Warner Bros. headquarters in California was in talks with Regal on this issue. Late in the day on February 2, 2015, the Cinemart received a letter from Warner Bros. stating it would not continue the simultaneous exhibition.

25.      A representative from Sony Pictures named Stella Leon, informed Cinemart that despite his requests, Sony Pictures would not give first-run pictures to Cinemart. Cinemart has also attempted to obtain licenses to many first-run films from Disney, Lionsgate, Paramount, and Universal and has been \ unsuccessful, when it comes to the largest, highest-profile blockbusters. Given that all of the distributors have refused to allocate first-run films to Cinemart, it appears that Regal has also demanded and entered into clearances with Warner Bros., Sony, Lionsgate, Paramount, and Universal, Disney and Fox. This allegation is based on Cinemart's inability to obtain licenses for virtually all first-run films from these distributors while Regal regularly obtains them, just as it does from Disney and Fox. In short, Cinemart cannot gain access to a supply of first-run films from even a *single* major distributor.

26. Cinemart has repeatedly requested film licenses from these six film distributors, often offering extremely attractive financial terms. In fact, Cinemart has offered the six above-mentioned distributors more advantageous terms than those Regal offered and the distributors ultimately rejected those offers. In other instances, distributors would simply not even entertain offers from Cinemart.

27. In granting clearances to Regal, the above-mentioned six film distributors are acting in a manner that is contrary to their own economic best interest. In the industry, it is standard operating procedure for distributors to grant licenses to multiple theaters within the same zone. This is because the distributors attempt to maximize the number of screens on which each of its first-run films is played. It is only in exceptionally rare cases where isolating a first-run film to a single theater will accomplish that goal.

28. Further, in the few instances where Cinemart was able to obtain first-run film licenses, it has amply demonstrated that it is fully capable of generating just as high of a gross revenue as Regal.

29. Cinemart has been informed privately by several individuals at the above-mentioned distributors that Regal has threatened and coerced film distributors into granting Regal clearances in Queens. As stated above, Regal controls a colossal circuit, comprising thousands of screens at hundreds of theaters. Many of these theaters are in noncompetitive monopoly zones. Regal's sheer size, coupled with the large number of theaters it controls in these noncompetitive zones, gives it substantial power—if not near-monopsony power—over the distributors because the distributors cannot risk losing screens in Regal's circuit. Regal's own public filings with the Securities and Exchange Commission admits and acknowledges that the size of its circuit provides it with a significant competitive advantage in negotiations.

30. In essence, Regal's threats are that if distributors do not give Regal clearances in Queens, Regal will retaliate by reducing the number of screens in noncompetitive zones. Cinemart has been informed that Regal has made such threats, which have been both express and implied. There is also a real fear and concern among the distributors that such retaliation will

occur.  No distributor can afford to lose access to screens for first-run films that cost hundreds of millions of dollars to produce and market.  As such, they have acceded to Regal's demands.  Regal's threats are a form of circuit dealing because Regal is using the power of its massive theater circuit to coerce exclusivity.  This exclusivity is to the detriment of smaller exhibitors lacking the muscle to retaliate by withholding screens.  The primary reason the major distributors have entered into clearances with Regal is because of this fear and concern as is evidenced by the fact that Regal is unable to obtain clearances in major markets where other large exhibitors such as AMC also compete.

### ANTICOMPETITIVE EFFECTS / HARM TO COMPETITION

31.    Regal's conduct with respect to its clearances and circuit dealing violates antitrust principles long established by the U.S. Supreme Court requiring that films be licensed on a film-by-film and theater-by-theater basis without the discriminatory preferences in favor of one or more dominant theater circuits.  Long ago, the Court observed that relationships within the film industry that limit an exhibitor's access to major films generate anticompetitive effects.

32.    As a direct and proximate result of Regal's conduct, the number of theaters that compete in the market for first-run films in Queens has, for all intents and purposes, been reduced from two theaters to a single theater—Regal.  It is likely that if Regal's unlawful conduct continues, Queens will lose its sole independent theater.  Even though Cinemart has not been driven out of business yet, consumers in Queens have only a single choice for seeing first-run films.

33.    The result of Regal's monopoly over first-run films has resulted in higher box office prices and the elimination or restriction of discounts that competitive pressures engender.  Further, Regal's foreclosure of Cinemart has not only enabled it to charge higher prices for admission to films and higher concession prices.  For example, a medium popcorn costs $7.25 at Regal while Cinemart gives a free popcorn for every patron that buys a ticket.  Likewise, prices for concessions at the Cinemart are substantially lower than those at the Midway.  The pricing of

concessions is immensely important for film exhibitors because that is the most profitable area for an exhibitor—ordinarily comprising 60 percent or more of a theater's profit.

34. Regal's conduct has also resulted in reduced total motion picture output because first-run films are shown on less screens than they would be in an unencumbered free market. In the absence of Regal's clearances, Queens residents would be able to see first-run films at two theaters and on a total of 14 screens. Instead, they can only see these films at one theater on 9 screens. This reduction in output has resulted in an overall decrease in the quantity and variety of first-run films for consumers to see in Queens.

35. To the detriment of consumers and competition, Regal has engaged in this anticompetitive conduct with predatory and exclusionary intent to deprive Cinemart of an opportunity to obtain the supply of first-run films needed for effective and fair competition in Queens, New York.

## DAMAGES AND CONTINUING INJURY

36. Regal has engaged in a continuing and continuous course of conduct with respect to the acts, practices, and conduct in violation of The Sherman Act and the Donnelly Act. These acts have injured Cinemart in an amount to be proven at trial and has caused, and will continue to cause, injury to competition, New York consumers, the public interest, and the business and property of Cinemart unless permanently enjoined.

## CLAIMS FOR RELIEF

### First Claim for Relief

### (Violation of The Sherman Act – 15 U.S.C. § 1)

37. Cinemart re-alleges the allegations contained in paragraphs 1 through 31 above.

38. The relevant product market for antitrust purposes in this case is first-run films. The relevant geographic market is Forest Hills, New York.

39. Beginning at a time previously unknown to Cinemart and continuing through the present, Regal's conduct as alleged constitutes a combination in restraint of trade in violation of 15 U.S.C. § 1. Specifically, Regal has entered into exclusive-dealing contracts or arrangements

with Disney, Warner Bros., Fox, Universal, Lionsgate, and Paramount for the overwhelming majority of first-run films in the Forest Hills market. ) Because of these contracts, competition in the market for first-run films in Queens has been substantially foreclosed or eliminated.

   40. Regal has obtained these exclusive-dealing contracts by using its colossal circuit power to coerce exclusivity from these distributors. Regal itself acknowledges that its size provides it with considerable leverage in negotiations, and it has taken advantage of this advantage in obtaining a wide network of clearances in Forest Hills. This conduct constitutes circuit dealing.

   41. Cinemart has suffered antitrust injury from Regal's conduct because Cinemart's injury—exclusion from the market for first-run films—corresponds with the rationale for finding clearances and circuit dealing unlawful—that is, that they foreclose access from a unique product necessary for competitive survival, thereby harming the competitive process.

   42. Regal's conduct has produced anticompetitive effects, and unless enjoined this Court, will continue to produce at least the following anticompetitive, exclusionary, and injurious effects on New York commerce:

   (a) competition for first-run films in Queens has been substantially and unreasonably restricted, lessened, foreclosed, and eliminated;

   (b) barriers to entry and expansion in the relevant market have been raised;

   (c) consumer choice has been, and will continue to be, significantly limited and constrained as to selection, price, and quality;

   (d) Regal has been able to charge supracompetitive prices for first-run films;

   (e) Regal has been able to charge supracompetitive prices for concessions at its theaters;

   (f) retail innovations, discounts, and promotions have been restricted, lessened, or eliminated at theaters exhibiting first-run films; and

   (g) output of first-run films in the relevant market has been reduced because there are fewer screens on which to exhibit such films.

43. These anticompetitive effects have harmed competition in the relevant market, consumers in the relevant market, and Cinemart.

44. There are no procompetitive effects flowing from Regal's anticompetitive conduct. But even if there were, these procompetitive effects do not outweigh the above-described anticompetitive effects.

45. As a direct and proximate result of Regal's unlawful conduct in furtherance of violations alleged, Cinemart has been injured in its business and property in an amount to be proven at trial and to be automatically trebled, as provided by U.S.C. § 1.

46. Cinemart also is entitled to recover from Defendants reasonable attorneys' fees, together with the costs of suit, as provided by 15 U.S.C. § 1.

47. Cinemart is also entitled to injunctive relief as provided by 15 U.S.C. § 1.

## Second Claim for Relief

### (Violation of the New York General Business Law –

### the Donnelly Act Sections 340-370

48. Cinemart re-alleges the allegations contained in paragraphs 1 through 42 above.

49. This Complaint is filed and these proceedings are instituted, pursuant to N.Y. General Business Law, Sections 340-370, commonly known as the Donnelly Act, to enjoin Defendants from engaging in the anticompetitive business acts and business practices alleged herein, in violation of that statute.

50. The conduct alleged herein constitutes unfair competition by means of unfair, unlawful, or fraudulent business acts or practices within the meaning of N.Y. General Business Law, Sections 340-370, and plaintiff is entitled to both damages and injunctive relief.

## Third Claim for Relief

### (Intentional Interference with Prospective Economic Advantage)

51. Cinemart re-alleges the allegations contained in paragraphs 1 through 46 above.

52. Cinemart enjoyed and continues to enjoy relationships with patrons of its theater that include a reasonable expectation of prospective future economic benefits to Cinemart from

continuing patronage to view a wide variety of high quality first run films.  At all relevant times herein, Regal had actual knowledge of this reasonable expectation of prospective future economic benefits to Cinemart and knew that this expectancy constituted a valuable business asset and form of revenue for Cinemart.

53. Cinemart continues to enjoy a reasonable expectation of prospective future economic benefits to Cinemart from fair competitive access to the licensing of films.  At all relevant times herein, Regal had actual knowledge of these reasonable expectations of prospective future economic benefits Cinemart and knew that this expectancy constituted a valuable business asset and form of revenue for Cinemart.

54. Regal intended to disrupt and interfere with, did in fact disrupt and interfere with, and continues to disrupt and interfere with Cinemart's economic relationships with the patrons of the Cinemart and with film distributors, which relationships carry with them a future economic benefit to Cinemart.

55. As a direct and proximate result of Regal's intentional anticompetitive conduct as alleged herein, which constitutes a combination to restrict trade in violation of 15 U.S.C. § 1 and unfair competition in violation of N.Y. ISC Law § 2403, Regal has prevented and continues to prevent Cinemart from being able to enter into agreements with distributors to exhibit films at the Cinemart Theater and has deprived and continues to deprive Cinemart of access to films to exhibit to patrons in its theater.  By engaging in this conduct, Regal acted and continues to act with intent to injure Cinemart in its business at the Cinemart and to gain a wrongful competitive advantage over Cinemart.

56. As a direct and proximate result of Regal's wrongful actions, Cinemart has been injured and continues to suffer injury in its business and property in that it has been foreclosed from competition on the merits and has lost revenue and profit that it would have otherwise earned but for Regal's conduct.  Cinemart is unable to exhibit industry films on a fair competitive basis and to offer other related goods and services to prospective patrons, and is consequently unable to obtain the economic benefits of increased ticket and concession sales at

the Cinemart Theater in Queens, New York. Furthermore, as a result of Regal's actions, the Cinemart has been and is forced to exhibit films as subsequent runs and therefore has been and is unable to benefit from the increased ticket and concession sales first run films would have generated.

57.     As a further direct and proximate result of Regal's unlawful conduct, Cinemart has been damaged in an amount subject to proof at trial.

58.     In doing the things alleged herein, Regal has acted willfully, maliciously, oppressively, and with full knowledge of the adverse effects of its actions on Cinemart and with willful and deliberate disregard of the consequences to Cinemart. As a direct result of the fraudulent, willful, and malicious conduct of Regal, Cinemart is entitled to exemplary and punitive damages in an amount subject to proof at trial.

## PRAYER FOR RELIEF

WHEREFORE, Cinemart prays for judgment against Regal as follows:

**As to the First Claim for Relief:**

1.      For compensatory damages against Regal in an amount subject to proof at the time of trial, and that those actual damages be trebled pursuant to 15 U.S.C. § 1, together with interest thereon at the maximum legal rate;

2.      For an injunction against Regal barring further violations of the antitrust laws pursuant to 15 U.S.C. § 1; and

3.      For attorneys' fees and costs pursuant to 15 U.S.C. § 1.

**As to the Second Claim for Relief:**

4.      For equitable and injunctive relief pursuant to Sections 340-370 of New York General Business Law, known as the Donnelly Act.

**As to the Third Claim for Relief:**

5.      For compensatory damages against Regal in an amount subject to proof at the time of trial, together with interest thereon at the maximum legal rate;

6.      For punitive damages; and

7. For an injunction against Regal barring further intentional interference with Cinemart's prospective economic advantage of the type alleged herein.

**As to All Claims for Relief:**

8. For costs of the suit incurred;

9. For interest at the maximum legal rate; and

10. For such other and further relief as the Court may deem just and proper.

Dated: July 9, 2015   By:   /s/ *Paul F. Condzal*
Paul F. Condzal (PC-4976)
  condzalesq@msn.com
1330 Avenue of The Americas, Suite 23A
New York, New York  10019
Telephone: (212) 688-3637
Facsimile: (646) 924-3406

***Attorneys for Plaintiff Cinema Village Cinemart, Inc.***

Dated: July 9, 2015   By:   /s/ *Maxwell M. Blecher*
Maxwell M. Blecher (State Bar No. 26202)
Howard K. Alperin (State Bar No. 158809) (HA-2864)
Theo "John" Giovanni Arbucci (State Bar No. 249811)
BLECHER COLLINS PEPPERMAN & JOYE, P.C.
515 South Figueroa Street, Suite 1750
Los Angeles, California 90071-3334
Telephone: (213) 622-4222
Facsimile: (213) 622-1656
E-mail:   mblecher@blechercollins.com
          halperin@blechercollins.com
          jarbucci@blechercollins.com

***Attorneys for Plaintiff Cinema Village Cinemart, Inc.***

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable.

Dated: July 9, 2015    By:    /s/ *Paul F. Condzal*
Paul F. Condzal (PC-4976)
*condzalesq@msn.com*
1330 Avenue of The Americas, Suite 23A
New York, New York 10019
Telephone: (212) 688-3637
Facsimile: (646) 924-3406

***Attorneys for Plaintiff Cinema Village Cinemart, Inc.***

Dated: July 9, 2015    By:    /s/ *Maxwell M. Blecher*
Maxwell M. Blecher (State Bar No. 26202)
Howard K. Alperin (State Bar No. 158809) (HA-2864)
Theo "John" Giovanni Arbucci (State Bar No. 249811)
BLECHER COLLINS PEPPERMAN & JOYE, P.C.
515 South Figueroa Street, Suite 1750
Los Angeles, California 90071-3334
Telephone: (213) 622-4222
Facsimile: (213) 622-1656
E-mail:   mblecher@blechercollins.com
              halperin@blechercollins.com
              jarbucci@blechercollins.com

***Attorneys for Plaintiff Cinema Village Cinemart, Inc.***

76712.1