UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CINEMA VILLAGE CINEMART, INC.,<br><br>               Plaintiff,<br><br>     v.<br><br>REGAL ENTERTAINMENT GROUP and Does 2<br>through 50, inclusive,<br><br>              Defendants. | Civil Action No. 1:15-cv-05488 (RJS)<br><br>**ORAL ARGUMENT REQUESTED** |

**REPLY MEMORANDUM OF LAW
IN SUPPORT OF DEFENDANT REGAL ENTERTAINMENT GROUP'S
MOTION TO DISMISS THE AMENDED COMPLAINT**

# <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ........................................................................................... 1

ARGUMENT ................................................................................................................... 2

I.     CVC FAILS TO STATE A CLAIM UNDER THE SHERMAN ACT ............................. 2

       A.     CVC Fails to Allege an Agreement ................................................. 2

            1.     CVC Fails to Allege an Agreement Between Regal and Warner Bros ....... 2

            2.     CVC Fails to Allege an Agreement With Other Distributors .................... 4

       B.     CVC Fails to Allege a Cognizable Geographic Market ........................................ 5

       C.     CVC Fails to Allege Harm to Competition ......................................................... 7

II.    CVC'S STATE LAW CLAIMS FAIL ................................................................. 10

CONCLUSION ................................................................................................................ 10

Defendant Regal Entertainment Group (Regal) respectfully submits this reply memorandum in further support of its Motion to Dismiss the Amended Complaint of Cinema Village Cinemart, Inc. (CVC) for failure to state a claim.

## PRELIMINARY STATEMENT

As shown in Regal's opening brief (the MTD), CVC fails to plead multiple indispensable elements of its Sherman Act and state law claims. Specifically, the Amended Complaint fails to plead any *agreement* between Regal and any film distributor, instead at best describing Regal's unilateral decision not to play at the Midway the same films as the Cinemart, and distributors' film licensing decisions in light of Regal's position. The Amended Complaint also fails to allege a plausible, cognizable geographic market limited to Forest Hills; its allegations squarely contradict the plausibility of such a market. Further, even if the Amended Complaint had alleged clearance agreements, such arrangements are presumptively lawful, and CVC fails to allege any anticompetitive effects to overcome that presumption. Finally, CVC fails to allege anything plausibly supporting its state antitrust and common-law claims.

CVC does not respond meaningfully to any of these fatal deficiencies and instead argues that its bare-bones, conclusory allegations should entitle it to discovery to see if it has an actual claim. But CVC ignores the operative legal standards of *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and its progeny. Indeed, CVC repeatedly cites pre-*Twombly* standards to excuse its pleading deficiencies and argue that questions of fact somehow preclude dismissal. CVC does not even acknowledge—much less distinguish—*Starlight Cinemas v. Regal Entertainment Group*, No. 14-5463, 2014 WL 7781018 (C.D. Cal. Oct. 23, 2014), which dismissed a similar complaint against Regal brought by a movie theatre represented by CVC's counsel here. *See also Starlight Cinemas v. Regal Entm't Grp.*, ECF No. 44, No. 14-5463 (C.D.

Cal. Feb. 4, 2015) (order denying leave to amend on futility and other grounds).  CVC's

remaining arguments are easily rejected.  This lawsuit should be dismissed with prejudice.

## ARGUMENT

## I.    CVC FAILS TO STATE A CLAIM UNDER THE SHERMAN ACT

The Amended Complaint fails to allege facts plausibly showing (i) an agreement that (ii)

has had an actual adverse effect on competition as a whole in a (iii) properly defined geographic

market, as required to state a claim under Section 1 of the Sherman Act.  *See* MTD 4.

### A.    CVC Fails to Allege an Agreement

CVC's response confirms that the Amended Complaint fails to make "allegations

plausibly suggesting (*not merely consistent with*) agreement[s]" between Regal and distributors,

rather than allegations that are just as consistent with unilateral conduct.  *Twombly*, 550 U.S. at

557 (emphasis added); *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50-51 (2d Cir. 2007).

#### 1.    CVC Fails to Allege an Agreement Between Regal and Warner Bros.

CVC first contends that because it pleaded "direct allegations of agreement" between

Regal and Warner Bros., additional "facts" and "details" are unnecessary.  Opp'n 7-8.  "Direct

evidence" of an agreement are allegations of fact that, if proved, would establish the existence of

an agreement without the fact-finder needing to infer an agreement.  *See, e.g.*, *Mayor and City

Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013) (recording of

phone call on which competitors agree to fix prices would be "direct evidence").  The allegations

on which CVC rests it argument are nothing of the kind, *see* Opp'n 7-8; instead, CVC offers

assumptions and inferences that are equally as consistent with unilateral conduct as concerted

action, *see Twombly*, 550 U.S. at 556.

Specifically, the Amended Complaint asserts that when CVC sought to license certain

"blockbuster first-run films from Warner Bros.," the distributor originally told CVC that "the

Cinemart would be playing all of [its] first run films day and date with the Midway from January 1, 2015 forward."  Am. Compl. ¶ 32.  "As a result, the Cinemart was able to show the movie 'American Sniper,'" but "in retribution, the Midway refused to play day and date with the Cinemart on the American Sniper film."  *Id*. ¶ 33.  Later, in February 2015, Cinemart sought to license *Jupiter Ascending*, but Warner Bros. "revoked its previous commitment to allow the Cinemart to play all first run films with Midway" and told CVC that "Warner Bros. headquarters in California was in talks with Regal on this issue."  *Id*. ¶¶ 34-35.  CVC then "received a letter from Warner Bros. that stated it would not continue the simultaneous exhibition."  *Id*. ¶ 36.

CVC baldly asserts that all of this occurred pursuant to an "exclusive clearance *agreement*."  Opp'n 2 (citing Am. Compl. ¶¶ 32-38) (emphasis added).  But nothing about these allegations suggests an agreement (much less constitutes "direct evidence" of an agreement), rather than Warner Bros. taking unilateral action in response to Regal's position that it would not play films day and date between the Midway and the Cinemart.

These allegations stand in stark contrast to those in *West Penn Allegheny Health System, Inc. v. UPMC*, 627 F.3d 85 (3d Cir. 2010), on which CVC principally relies.  *See* Opp'n 7.  In *West Penn*, the complaint alleged, among other direct evidence of an agreement, that:  (i) the defendant health insurer expressly admitted that it could not deal with the plaintiff without violating its "probably illegal" agreement with the plaintiff's competitor (the other defendant); (ii) a specific letter referring to the agreement; and (iii) a statement by one defendant's CEO that he had agreed with the other defendant to eliminate competition with that defendant.  *Id*. at 100. The complaint there also provided a detailed account of meetings and discussions between the defendants through which the agreement was formed, as well as detailed allegations about the specific quid pro quo substance of the agreements.  *Id.* at 93-94, 100; *see also W. Penn Allegheny*

- 3 -

*Health Sys., Inc. v. UPMC*, No. 209-480, 2009 WL 3221750, at ¶¶ 56-95 (W.D. Pa. Aug. 28, 2009) (Amended Complaint).  Here CVC alleges no such details or anything else constituting "direct evidence" of an agreement between Regal and Warner Bros.[1]

As previously shown, these allegations are not cognizable circumstantial evidence of agreement either.  *See* MTD 7-8.  The bare allegation that Warner Bros. decided to license some first-run films to Regal instead of CVC, whether in response to pressure from Regal or otherwise, is a far cry from alleging that Warner Bros. acted pursuant to an exclusivity agreement with Regal.  That is, Theatre X can unilaterally refuse to exhibit films that are playing at Theatre Y down the street, and a distributor must then decide between Theatre X and Theatre Y when licensing a given film.  As a matter of law, that a distributor licenses some films to X and others to Y does not show that the distributor reached an "agreement" with Theatre X.  *See id.* at 7 (citing *Monsanto Co v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 761 (1984)).

### 2.    CVC Fails to Allege an Agreement With Other Distributors

CVC's circumstantial allegations that Regal formed agreements with Disney, Lionsgate, Paramount, and Universal plainly are insufficient.  CVC argues that given the supposed Warner Bros. agreement, additional agreements with other distributors are "just a small inferential step" away.  Opp'n 8.  But CVC fails to plausibly allege an agreement with Warner Bros. in the first place, and, in any event, such agreement would provide no basis to infer *separate* agreements with four other distributors.  *See, e.g.*, *In re Libor-Based Fin. Instruments Antitrust Litig.*, No. 11-2262, 2015 WL 4634541, at *40 (S.D.N.Y. Aug. 4, 2015) (rejecting "impermissible inference" that conduct as to one product is sufficient to plead conduct as to other products).

---

[1]    CVC asserts in passing that Regal's "contracts" with distributors constitute the relevant exclusivity "agreements" under Section 1.  *See* Opp'n 1-2.  But CVC does not identify any such "contracts" or any supposed exclusivity provisions therein.

CVC also argues that it plausibly has alleged an agreement by inference because the four distributors supposedly acted against their economic best interests, there was an absence of competitive bidding, and Regal has market power. Opp'n 9-11. Not so. The Amended Complaint's allegations explain why a distributor acting in its economic self-interest would unilaterally choose the superior Midway theatre. *See* MTD 8-9 & n.2 (citing Am. Compl. ¶¶ 15, 17, 19, 23). Nor does a supposed absence of competitive bidding suggest an agreement: A distributor could have just as easily unilaterally decided to license certain films only to the Midway without bidding in response to Regal's decision not to play day and date with the Cinemart.[2] *See Twombly*, 550 U.S. at 557. Likewise, CVC's allegation that distributors were "coerced" into licensing films to the Midway due to Regal's alleged market power does not make an *agreement*—as opposed to a unilateral response—more plausible.[3] *See* Opp'n 9-10.

### B.      CVC Fails to Allege a Cognizable Geographic Market

CVC's response regarding its geographic market allegations fares no better. In addition to largely ignoring Regal's opening brief, CVC mostly argues the unremarkable point that

---

[2]      CVC cites *Coalition For ICANN Transparency, Inc. v. VeriSign, Inc.*, 611 F.3d 495 (9th Cir. 2010), *see* Opp'n 9, to support its assertion that the absence of competitive bidding indicates the existence of an agreement, but the question in *VeriSign* was not whether an agreement existed—there were executed written contracts—but whether certain provisions in the contracts resulted in actionable harm to competition. *Id.* at 502-05.

[3]      CVC primarily relies on inapposite tying cases for the erroneous proposition that courts "have implied an exclusivity deal whenever a seller has used any coercive method that causes buyers to purchase its products exclusively." Opp'n 9. For example, in *Tire Sales Corp. v. Cities Service Oil Co.*, 637 F.2d 467 (7th Cir. 1980), the court found sufficient evidence of coercion to establish a tying claim. *See id.* at 471-72. However, even where there is coercion, which is not plausibly alleged here, there still must be an *agreement* resulting from the coercion to use the tied product in order to sustain a Section 1 claim. *See Shop & Save Food Markets, Inc. v. Pneumo Corp.*, 683 F.2d 27, 30 (2d Cir. 1982) ("a tying arrangement cannot exist unless the buyer was actually *coerced* by the seller into *agreeing* to buy the tied product"). CVC does not allege tying here, and it otherwise fails to adequately allege any agreement. Further, another case that CVC cites, *LePage's Inc. v. 3M*, 324 F.3d 141 (3d Cir. 2003), did not even involve a Section 1 claim, but rather addressed a unilateral conduct claim under Section 2. *Id.* at 157.

geographic markets are sometimes narrow.  *See* Opp'n 12-13.  But the problem here is not the size of Forest Hills, but rather that CVC fails to plead facts plausibly supporting the conclusion that Forest Hills is the cognizable geographic market.  *See* MTD 10-14.

Relying on the flaws in its Amended Complaint, CVC's response cites three allegations to support its geographic market claim.  *See* Opp'n 13 (citing Am. Compl. ¶ 23).  **First**, the Amended Complaint alleges that it "is not reasonably practicable for the overwhelming majority of *Queens* residents to leave *Queens* to see movies on a regular basis, even if prices in *Queens* increased significant[ly]."  Am. Compl. ¶ 23 (emphasis added).  As explained in Regal's opening brief, this allegation does not support a geographic market limited to *Forest Hills*.  *See* MTD 13.  To the contrary, it suggests a geographic market at least as large as all of *Queens*, which the Amended Complaint elsewhere suggests might be the actual geographic market.  *See id.*  **Second**, CVC relies on the allegation that "Forest Hills consumers frequent theaters in Forest Hills to see first-run films."  Am. Compl. ¶ 23.  But even if true, this allegation does not suggest that the same consumers do not also frequent theatres outside Forest Hills, or that consumers outside Forest Hills do not visit theatres in Forest Hills.  *See* MTD 12.  Without such allegations, the complaint does not plausibly define the outer boundaries of the proposed geographic market.  **Finally**, CVC alleges "that residents from other cities or municipalities do not often come to *Queens* to see films because the films are otherwise available in more convenient venues."  Am. Compl. ¶ 23 (emphasis added).  Again, this allegation suggests only that the market is at least as broad as Queens, not just the Forest Hills neighborhood.  *See* MTD 13.  Moreover, CVC's response ignores its allegation that "Forest Hills is easily accessible by subway, rail, bus and car," *see* Am. Compl. ¶ 23, which undermines its assertion that customers do not travel to or from Forest Hills to see films, *see* MTD 12-13.

Recognizing the inadequacy of its allegations, CVC resorts to arguing that dismissal is inappropriate because market definition is a question of fact.  Opp'n 14.  But where, as here, the alleged market definition is "facially unsustainable," *Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1045 (9th Cir. 2008), courts routinely dismiss Sherman Act claims as a matter of law.  *See, e.g.*, *Chapman v. New York State Div. for Youth*, 546 F.3d 230, 238 (2d Cir. 2008) (upholding dismissal on the pleadings where "proposed relevant market [] clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor"); *Mathias v. Daily News L.P.*, 152 F. Supp. 2d 465, 482-83 (S.D.N.Y 2001) (same).  CVC ignores this authority, and the Amended Complaint's incoherent and contradictory allegations do not plead a plausible market limited to Forest Hills.

## C.    CVC Fails to Allege Harm to Competition

Even if CVC had alleged an actual clearance agreement, it fails to overcome the presumption that such agreements are procompetitive and "presumptively legal" under the antitrust laws.  *E&L Consulting, Ltd. v. Doman Indus. Ltd.*, 472 F.3d 23, 30 (2d Cir. 2006).  CVC alleges, at most, that *it* has been unable to show certain first-run films.  *See* Am. Compl. ¶ 37.  But alleged harm to a *competitor* does not suffice to show harm to *competition*.  *See Virgin Atl. Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 265 (2d Cir. 2001) ("The Sherman Act and other antitrust laws are designed to protect competition, not individual competitors.").

Although CVC argues that Regal has "eliminat[ed] retail competition" because the Cinemart has supposedly been "forced from th[e] market," Opp'n 15, the allegations show that CVC remains in the market and, in fact, *competes* with Regal for first-run films, *see, e.g.*, Am. Compl. ¶¶ 40-41.  Further, "[c]ompetition-for-the-contract is a form of competition that antitrust laws protect rather than proscribe," and such allegations do not state a Sherman Act claim.  *Paddock Publ'ns, Inc.*, *Chicago Tribune Co.*, 103 F.3d 42, 45 (7th Cir. 1996).  As explained

previously, whenever a company loses a competition for an exclusive license or distribution

agreement, it will be unable to sell or distribute *that* product in "competition" with the company

that won the exclusive.  *See* MTD 20-24.  That CVC must compete for patrons by showing

different films than the Midway does not constitute market-wide harm to competition or the

competitive process.[4]  *Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prod., Inc.*, 129 F.3d

240, 245 (2d Cir. 1997) (eliminating retail competition between sellers of the same product not

actionable harm to competition).

　　　　CVC otherwise invokes a boilerplate list of supposed harms—higher prices, reduced

consumer choice, and reduced output.  Opp'n 15-17.  But CVC does not allege any *facts*

plausibly suggesting that any of this occurred as a result of alleged agreements, much less that

any effects were the result of a lack of competition.[5]  Nor does CVC allege anything suggesting

that admission or concession prices would be lower if the Cinemart and the Midway played the

same films day and date, rather than offering consumers different movies.  *See* MTD 20.

---

[4]　　CVC argues that such exclusivity "reduc[es] consumer choice" for films, Opp'n 14, but it
fails to address the two clearance cases discussed in Regal's opening brief—*Six W. Retail
Acquisition, Inc. v. Sony Theatre Mgmt. Corp.*, No. 97-5499, 2004 WL 691680, at *10 (S.D.N.Y.
Mar. 31, 2004), and *Reading Int'l, Inc. v. Oaktree Capital Mgmt. LLC*, No. 03-1895, 2007 WL
39301, at *14 (S.D.N.Y. Jan. 8, 2007)—which squarely hold that "the mere possibility that [a]
consumer might have to see his or her first choice movie at his or her second choice theatre . . .
does not mean that there has been an actionable harm to consumer choice or competition."  CVC
cites *Ross v. Bank of America, N.A. (USA)*, 524 F.3d 217 (2d Cir. 2008), *see* Opp'n 15, but that
case merely held that a reduction in consumer choice could constitute an injury-in-fact for
Article III standing.  *Id.* at 225.  In fact, the Second Circuit expressly disavowed holding that a
reduction in consumer choice would constitute harm to competition under the antitrust laws.  *Id.*

[5]　　For example, CVC wrongly argues that the Midway's allegedly higher prices reflect
harm to competition.  Opp'n 15-16.  But "[c]ompetitive markets are characterized by both price
and quality competition, and a firm's comparatively high price may simply reflect a superior
product."  *Harrison Aire, Inc. v. Aerostar Int'l, Inc.*, 423 F.3d 374, 381 (3d Cir. 2005).  Here, the
Amended Complaint highlights the superior movie-going experience at the Midway, which
explains why prices would be higher.  *See* MTD 20.

Similarly, CVC fails to allege reduced output and consumer choice caused by any agreements.  CVC argues that output must be lower because CVC supposedly has lost its "freedom to compete" and "'first-run films are shown on less screens than they would be in an unencumbered free market.'"  Opp'n 16 (quoting Am. Compl. ¶ 51).  But nothing in the Amended Complaint suggests that CVC is not free to compete for an exclusive license to any particular first-run film or for any moviegoers interested in seeing those films.  *See* MTD 23-24.  At the same time, there is no plausible allegation that consumers in Forest Hills (much less all of Queens) had less access to first-run films *because* the Cinemart and the Midway do not show *the same first-run films*.  Instead, contrary to CVC's suggestion, courts have made clear that clearances generally *increase* output and consumer choice for films by fostering diversity across available screen space.  *See id.* at 21-22 (citing *Orson v. Miramax Film Corp.*, 79 F.3d 1358, 1372 (3d Cir. 1996); *Theee Movies of Tarzana v. Pacific Theatres, Inc.*, 828 F.2d 1395, 1399 (9th Cir. 1987)).

Relying on pre-*Twombly* cases, CVC also argues that "the issue of whether two theaters are in substantial competition and whether the clearance restrains competition are quintessential fact issues not ripe for a motion to dismiss."[6]  Opp'n 18-19.  But post-*Twombly*, dismissal is appropriate where, as here, a plaintiff fails to allege facts plausibly suggesting harm to competition.  *See, e.g.*, *Ace Arts, LLC v. Sony/ATV Music Publ'g, LLC*, 56 F. Supp. 3d 436, 449

---

[6]     CVC's conclusory allegations that the two theatres are not in "substantial competition," Am. Compl. ¶¶ 5, 21, are belied by its substantive allegations that consumers "choose" between the Midway and Cinemart and view them as competitive alternatives, *id.* ¶¶ 1, 49, 50-52.  And if the theatres are *not* in substantial competition, then the Cinemart could not constrain pricing or other competitive behavior at the Midway, the alleged conduct could never harm competition, and CVC could not have a valid antitrust claim for that reason.  *See, e.g.*, *Universal Amusements Co. v. Gen. Cinema Corp. of Tex., Inc.*, 635 F. Supp. 1505, 1523 (S.D. Tex. 1985) (allegations of lack of substantial competition created "fundamental problem" for plaintiff's antitrust claims that depended on showing harm to competition).

- 9 -

(S.D.N.Y. 2014) (granting motion to dismiss Section 1 claim where plaintiff failed to allege

harm to competition in a relevant market); *Integrated Sys. & Power, Inc. v. Honeywell Int'l, Inc.*,

713 F. Supp. 2d 286, 299 (S.D.N.Y. 2010) (same).  And as in *Starlight*, the Amended Complaint

here alleges no market-wide impact to overcome the presumption that clearance agreements are

procompetitive and legal under the antitrust laws.[7]  *See* MTD 14-15; *Starlight Cinemas*,

2014 WL 7781018, at *2.  Finally, CVC's few allusions in its opposition to Regal's circuit and

supposed coercion, *see* Opp'n 10, 17, do not meaningfully address Regal's multiple arguments

for why the Amended Complaint fails plausibly to allege "circuit dealing"—including the utter

*implausibility* that Regal would (or credibly could) issue "ultimatums of total non-distribution"

nationally to coerce distributors into giving the Midway preferential treatment over a single, non-

competing (according to CVC) theatre in Queens, *see* Am. Compl. ¶ 44.  *See* MTD 16-20.

## II.      CVC'S STATE LAW CLAIMS FAIL

CVC agrees that its state law claims rise and fall with its Sherman Act claims.  Opp'n 19-

21.  They are accordingly subject to dismissal for the reasons stated above and in the opening

brief.

## CONCLUSION

The Amended Complaint should be dismissed in its entirety with prejudice.

---

[7]      Contrary to CVC's assertion, Regal's position is not that clearances are "categorically
lawful."  Opp'n 17.  CVC also is wrong that clearances are condemned as unlawful under the
Sherman Act merely because the cleared theatres are not in substantial competition.  *Id.* at 18.
As the clearance cases reflect, where two theatres are in substantial competition, clearances
generally have been presumed reasonable absent facts showing them to be unreasonable.  *See,
e.g.*, *Theee Movies of Tarzana*, 828 F.2d at 1399; *Orson*, 79 F.3d at 1372.  But whether or not the
theatres are in substantial competition, the plaintiff must allege, and ultimately prove, the
elements of a rule of reason antitrust violation.  *See, e.g.*, *Theee Movies of Tarzana*, 828 F.2d at
1399 (analyzing and upholding alleged clearance under rule of reason); *Reading Int'l*, 2007 WL
39301, at *10 (same); *Universal Amusements*, 635 F. Supp. at 1521-22 (same).

Dated:  New York, New York
         February 1, 2016

**WILMER CUTLER PICKERING HALE
AND DORR LLP**

By: */s/ David Sapir Lesser*
David Sapir Lesser
7 World Trade Center
250 Greenwich Street
New York, NY  10007
Tel:  (212) 230-8800
Fax:  (212) 230-8888
david.lesser@wilmerhale.com

Leon B. Greenfield (*pro hac vice*)
Jeffrey D. Ayer (*pro hac vice*)
Perry A. Lange (*pro hac vice*)
1875 Pennsylvania Avenue, N.W.
Washington, DC  20006
Tel:  (202) 663-6000
Fax:  (202) 663-6363
leon.greenfield@wilmerhale.com
jeffrey.ayer@wilmerhale.com
perry.lange@wilmerhale.com

*Counsel for Defendant Regal Entertainment Group*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 1, 2016, I caused a true and correct copy of the foregoing Reply Memorandum of Law In Support of Defendant Regal Entertainment Group's Motion to Dismiss the Amended Complaint to be served via this Court's CM/ECF system upon all counsel of record.


Dated:  February 1, 2016                         By: */s/ David Sapir Lesser*