UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CINEMA VILLAGE CINEMART, INC.,

           Plaintiff,

-v-

REGAL ENTERTAINMENT GROUP *et al.*,

           Defendants.

No. 15-cv-05488 (RJS)
OPINION AND ORDER

---

RICHARD J. SULLIVAN, District Judge:

    Plaintiff Cinema Village Cinemart ("CVC") brings this action against Regal Entertainment Group ("Regal") and unidentified Regal employees (Does 2–50), alleging that Defendants entered into unlawful trade agreements with various film distributors and tortiously interfered with Plaintiff's prospective economic advantage. Now before the Court is Defendant Regal's motion to dismiss the Amended Complaint for failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6). For the following reasons, Defendant's motion is granted.

## I. BACKGROUND

### A. Facts

    This case concerns the competitive market for licenses to show newly released feature-length films.[1] CVC operates the five-screen "Cinemart" movie theater complex in the Forest Hills neighborhood of Queens, New York. Located on a side street among antique shops, the Cinemart

---

[1] The following facts are taken from the Amended Complaint, filed on October 20, 2015. (Doc. No. 30 ("Amended Complaint" or "Am. Compl.").) In ruling on Defendant's motion, the Court has also considered Defendant's memorandum of law (Doc. No. 35 ("Mem.")), Plaintiff's opposition (Doc. No. 36 ("Opp'n")), and Defendant's reply (Doc. No. 37 ("Reply")).

offers low ticket and concession prices and serves primarily local, elderly customers. (Am. Compl. ¶¶ 18–20, 23.) Regal operates hundreds of movie theater complexes across the country, including the "Midway" theater complex in Forest Hills. The Midway is an upscale, modern nine-screen multiplex that features stadium-style seating and sits on a main thoroughfare near the commercial center of Forest Hills. The two theaters are situated about a mile apart. (*Id.* ¶¶ 17, 23.)

Both CVC and Regal purchase licenses for "first-run" films from national film distribution companies such as Warner Bros., Twentieth Century Fox, Universal, and Disney. "First run" refers to a film's initial theatrical release. The first run typically lasts only a few weeks before secondary and tertiary releases to pay-per-view, DVD, and internet streaming. (*Id.* ¶ 11.) For a variety of reasons, theatrical exhibition is most profitable during the first run, after which moviegoer demand generally abates. (*Id.* ¶¶ 11, 24.) Access to first-run licenses is critical to the commercial viability of both CVC and Regal. (*Id.* ¶ 24.)

In January 2015, Warner Bros. advised CVC that it was willing to license first-run films to be shown at the Cinemart on the same dates as at the Midway. (*Id.* ¶ 32.) A month later, however, Warner Bros. informed CVC that it would not license first-run films to be shown at both the Midway and the Cinemart simultaneously, and it confirmed this decision by letter the next day. (*Id.* ¶¶ 35–36.) Warner Bros.' about-face followed the Midway's refusal to play a particular first-run film, *American Sniper*, on the same dates as the Cinemart. (*Id.* ¶¶ 32–35.) CVC has also struggled to obtain first-run licenses from other major film distributors. (*Id.* ¶¶ 37–38.) CVC attributes its licensing difficulties to the distributors' apparent preference for showing first-run films exclusively at the Midway. (*Id.* ¶ 47.) Specifically, CVC claims that various film distributors have refused to license first-run films to the Cinemart as a result of exclusive dealing agreements ("clearances") with Regal; CVC further claims that Regal extracted these agreements from the

2

film distributors, against their economic interests, by using its considerable market power as a major nationwide theater chain. (*Id.* ¶¶ 25–32.)

## B. Procedural History

On July 14, 2015, CVC, a New York corporation whose principal place of business is in New York, filed the first complaint in this action against Regal, a Delaware corporation with its principal place of business in Tennessee, and the John Doe Defendants, none of whom have been further identified or served. (Am. Compl. ¶¶ 5–7; Doc. No. 1.) On October 20, 2015, after a pre-motion conference, CVC filed an Amended Complaint asserting three causes of action: (1) violation of the Sherman Antitrust Act, 15 U.S.C. § 1; (2) violation of New York General Business Law §§ 340–370 (the Donnelly Act); and (3) tortious interference with prospective economic advantage under New York law. (Am. Compl. ¶¶ 55–76.) Regal filed its motion to dismiss on December 18, 2015. (Doc. No. 34.) The motion was fully briefed on February 1, 2016. (Doc. No. 37.)

## II. LEGAL STANDARD

To withstand a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must "provide the grounds upon which [the] claim rests." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007); *see also* Fed. R. Civ. P. 8(a)(2) ("A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief . . . ."). To meet this standard, plaintiffs must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In reviewing a Rule 12(b)(6) motion to dismiss, a court must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff. *ATSI Commc'ns*, 493 F.3d at 98. That tenet, however, "is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. Thus, a pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. If the plaintiff "ha[s] not nudged [its] claims across the line from conceivable to plausible, [its] complaint must be dismissed." *Id.* at 570.

### III. DISCUSSION

#### A. Sherman Act Claim

Section 1 of the Sherman Antitrust Act prohibits "[e]very contract, combination . . . , or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. Because restraint is "the very essence of every contract," courts have long construed the statute to proscribe only those arrangements that unreasonably restrain trade. *Nat'l Soc. of Prof'l Eng'rs v. United States*, 435 U.S. 679, 687–88 (1978). To plead a violation of Section 1, then, a plaintiff must allege facts showing (1) "a combination or some form of concerted action between at least two legally distinct economic entities," and (2) "that the agreement constituted an unreasonable restraint of [interstate] trade." *Capital Imaging Assocs. P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 542 (2d Cir. 1993). Defendant Regal argues that the Amended Complaint fails to properly plead either element. The Court agrees.

#### 1. Concerted Action

Because Section 1 "does not prohibit [all] unreasonable restraints of trade . . . but only restraints effected by a contract, combination, or conspiracy," the "crucial question" with regard to the first element is whether a plaintiff plausibly alleges anticompetitive conduct stemming from

an *agreement*, rather than from independent or parallel business decisions. *Twombly*, 550 U.S. at 553. To survive a motion to dismiss, "a complaint must contain 'enough factual matter (taken as true) to suggest that an agreement [to engage in anticompetitive conduct] was made.'" *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 556). A plaintiff may allege facts constituting either direct evidence of an agreement or circumstantial evidence that allows the Court to infer the existence of an agreement. *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984). A plaintiff may not, however, make "conclusory allegation[s] of agreement." *Twombly*, 550 U.S. at 557; *see also Amron v. Morgan Stanley Inv. Advisors Inc.*, 464 F.3d 338, 344 (2d Cir. 2006) ("[B]ald assertions and conclusions of law will not suffice."). Nor may a plaintiff allege facts that are merely compatible with an unlawful agreement. Since business arrangements that result from independent action can often resemble those that result from unlawful agreement, a complaint "must provide 'some factual context suggesting [that the parties reached an] agreement,' not facts that would be 'merely consistent' with an agreement." *Anderson News, LLC v. Am. Media, Inc.*, 680 F.3d 162, 183–84 (2d Cir. 2012) (quoting *Twombly*, 550 U.S. at 549, 557); *see also Monsanto*, 465 U.S. at 764 (complaint's allegations must plausibly suggest "conscious commitment to a common scheme designed to achieve an unlawful objective"); *Mayor & City Council of Baltimore v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013) ("[A]lleging parallel conduct alone is insufficient, even at the pleading stage.").

CVC's Amended Complaint purports to allege facts that constitute both direct and circumstantial evidence of unlawful agreements between Regal and various film distributors. None of CVC's allegations, however, plausibly suggests the existence of such agreements. The Amended Complaint first recounts a series of interactions between CVC and Warner Bros.,

culminating in Warner Bros.' refusal to continue to grant CVC licenses to play its first-run films. (Am. Compl. ¶¶ 32–36.) The Amended Complaint then details one phone conversation in which an unnamed Warner Bros. representative informed CVC that "Warner Bros. headquarters in California was in talks with Regal on this issue." (*Id.* ¶ 35.) On the basis of that vague and unattributed allusion to Regal, the Amended Complaint declares that Warner Bros. acted "[i]n furtherance of [an] exclusive clearance agreement with Regal." (*Id.*) This bald assertion, however, is the kind of "conclusory allegation of agreement" that "does not supply facts adequate to show illegality." *Twombly*, 550 U.S. at 557. To claim the existence of an exclusive dealing arrangement is simply to recite a conclusion of law. To support that conclusion with nothing more specific than alleged "talks" between Warner Bros. and Regal is no remedy. The Amended Complaint's meager factual allegations regarding the dealings between Regal and Warner Bros. are speculative and conclusory, and thus wholly inadequate to support the existence of an unlawful agreement under Section 1.

      The Amended Complaint fares no better with its allegations of unlawful agreements between Regal and various other film distributors. (Am. Compl. ¶¶ 25, 28–32, 37–46.) In this regard, CVC relies primarily on (1) the assertion that it has been unable to obtain licenses for "many" first-run films, "especially for the largest, highest-profile blockbusters," from a number of major distributors besides Warner Bros. (*id.* ¶¶ 37–38), and (2) the presumption that this state of affairs was caused by "Regal's representatives" demanding and receiving exclusive agreements from the distributors (*id.* ¶¶ 25, 32, 38–39, 47). The Amended Complaint supplements these conclusory assertions with observations about Regal's considerable market power and about the favorable terms CVC has offered film distributors (*id.* ¶¶ 26–27, 40–42), both of which, CVC argues, support the inference that Regal wrested exclusive dealing agreements from the film

distributors by using undue pressure and threats of retaliation (*id.* ¶¶ 28–31, 42–43, 45–46; Opp'n 8–10).  The Amended Complaint also reports that representatives of various film distributors have "acknowledged that Regal obtained clearances and that Regal controlled the clearances."  (*Id.* ¶ 40.)

Once again, these allegations fail to constitute "plausible grounds to infer an [unlawful] agreement" sufficient to state an antitrust claim.  *Twombly*, 550 U.S. at 556.  First, even if the film distributors' refusal to license first-run films to CVC is "consistent with" a conspiracy or some other form of unlawful agreement, it is, on the facts alleged, "just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market."  *Id.* at 554.  As Regal argues (*see* Mem. 7), and common sense confirms, Regal could have made the unremarkable business decision to devote its screens to films that do not play simultaneously at a nearby theater.  In light of that decision, distributors of first-run films might reasonably have elected to license films to Regal rather than to CVC, perhaps seeing greater value in Regal's brand, location, and "upscale" amenities.  (Am. Compl. ¶¶ 17–21, 23.)  Without more, the simple fact that various film distributors have chosen to deal with Regal and not CVC is "merely consistent" with an agreement, which is clearly not enough to establish the first element of a Section 1 claim.  *Twombly*, 550 U.S. at 557; *see also Monsanto*, 465 U.S. at 761 (a party "generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently"); *Williams v. Citigroup, Inc.*, No. 08-cv-9208 (LAP), 2009 WL 3682536, at *5 (S.D.N.Y. Nov. 2, 2009) ("It is certainly not illegal for one party to announce terms of dealing and the counterparty to acquiesce to those terms . . . ."), *aff'd in part and vacated in part on other grounds*, 659 F.3d 208 (2d Cir. 2011).

Similarly, CVC's assertions that (i) agents of several film distributors represented that Regal holds some sort of exclusive dealing agreements, and (ii) certain "industry individuals" intimated that Regal obtained those agreements by threat and coercion (Am. Compl. ¶¶ 40, 44) are as conclusory and devoid of specifics as CVC's "firsthand" assertions.  They say nothing about the Cinemart or CVC specifically, nor do they say anything more generally about the contents of the agreements, when or how they were entered, what theaters or films they concerned, or the nature of the supposed threats that induced them.  Needless to say, there is no reason to treat the vague and conclusory allegations of industry insiders differently from CVC's own vague and conclusory representations.  A legal conclusion without sufficient supporting facts to "nudge" it "across the line from conceivable to plausible" does not pass muster merely because it comes from a third party.  Thus, even accepting as true CVC's characterizations of reports from industry insiders, those reports still amount to "bald assertions and conclusions of law" which, without further specific factual allegations, "will not suffice."  *Amron*, 464 F.3d at 344; *see also Port Dock & Stone Corp. v. Oldcastle Ne., Inc*., 507 F.3d 117, 121 (2d Cir. 2007) (giving "no effect" on motion to dismiss to "legal conclusions couched as factual allegations").

For all these reasons, the Court finds that the Amended Complaint alleges nothing more than conduct that is merely consistent with concerted action, and no facts suggesting that the parties actually reached an agreement.  To state a claim under Section 1 of the Sherman Act, more is needed.

### 2.  Unreasonable Restraint of Trade

Even if the Amended Complaint sufficiently alleged the existence of agreements between Regal and the film distributors, dismissal would still be warranted, since the Amended Complaint also fails to plausibly allege an unreasonable restraint of trade, the second element of a Section 1

claim. As noted above, if a Section 1 plaintiff "establishes the existence of an illegal contract or combination, it must then proceed to demonstrate that the agreement constituted an unreasonable restraint of trade either per se or under the rule of reason." *Capital Imaging Assocs.*, 996 F.2d at 542. Where, as here, a complaint pleads a violation of Section 1 on the basis of vertical agreements that do not involve price-fixing, courts analyze the allegedly anticompetitive practice according to the rule of reason. *K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.*, 61 F.3d 123, 127 (2d Cir. 1995). That analysis "seeks to determine if the alleged restraint is unreasonable because its 'anticompetitive effects outweigh its procompetitive effects.'" *E&L Consulting, Ltd. v. Doman Indus. Ltd.*, 472 F.3d 23, 29 (2d Cir. 2006) (quoting *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 342 (1990)). At the pleading stage, the rule of reason requires a plaintiff to allege facts "showing that the challenged action has had an *actual* adverse effect on competition as a whole in the relevant market." *K.M.B. Warehouse*, 61 F.3d at 127. Exclusive distributorships, which are "presumptively legal," do not alone constitute actual harm to competition. *E&L Consulting*, 472 F.3d at 30; *see also Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc.*, 129 F.3d 240, 244 (2d Cir. 1997) ("Nor is it a violation of the antitrust laws, without a showing of an actual adverse effect on competition market-wide, for a manufacturer to terminate a distributor . . . and to appoint an exclusive distributor.").

CVC's Amended Complaint defines the relevant market as the Forest Hills neighborhood of Queens, New York (Am. Compl. ¶¶ 1, 22), and claims three harms to competition in that market: (1) elimination of retail competition and reduced consumer choice; (2) higher box office and concession prices; and (3) a reduction in the number of screens on which moviegoers can watch first-run films (*id.* ¶¶ 48–52; *see also* Opp'n 15–17). Upon inspection, however, the Court finds that none of these constitutes market harm that amounts to an unreasonable restraint of trade.

First, it is improper to characterize the harms alleged by CVC as three and distinct. Elimination of competition may lead to higher prices and fewer choices in a given market, but the elimination of competition is not in itself a separate actionable harm. The rule of reason weighs the anticompetitive *effects* of the elimination of competition against any procompetitive *effects*. *E&L Consulting*, 472 F.3d at 29 (emphasis added) (dismissing antitrust claim where plaintiff alleged no actual injury to competition beyond existence of exclusive distributorship); *see also Elecs. Commc'ns*, 129 F.3d at 241 (dismissing antitrust claim where plaintiff alleged no actual injury to competition beyond elimination of competition between sellers of same product). Thus, in asserting that Regal has eliminated competition in the relevant market, CVC simply states a potential cause of actual market injury, not a standalone market harm.

Second, and relatedly, to the extent the elimination of competition harms competitors rather than consumers or competition as a whole, it is not a market harm under the Sherman Act. *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) ("The antitrust laws . . . were enacted for the protection of competition not competitors."). The Amended Complaint attempts to link CVC's alleged "exclusion from the market for first-run films" to "foreclose[d] access [to] a unique product," which in turn "harm[s] the competitive process." (Am. Compl. ¶ 59.) But this chain of reasoning merely establishes that, on the facts asserted, consumers must watch first-run films at one theater rather than at another. Without more, that state of affairs does not constitute actionable harm, since "consumers' inability to buy the same product from a different seller only harms that seller, and does no cognizable harm to competition as a whole." *Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.*, 985 F. Supp. 2d 612, 620 (S.D.N.Y. 2013); *see also Six West Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp.*, No. 97-cv-5499 (LAP), 2004 WL 691680, at *10 (S.D.N.Y. Mar. 31, 2004), *aff'd sub nom. Six West Retail*

*Acquisition, Inc. v. Sony Pictures Entm't Corp.*, 124 F. App'x 73 (2d Cir. 2005) ("Every licensing agreement between an exhibitor and distributor will restrain trade to some extent . . . . But the mere fact that a consumer who might, for example, prefer to watch a film at [one theater] has to instead go to another nearby theatre to see that film does not mean that there has been an actionable harm to consumer choice or competition.").

Third, and most importantly, the harm to competition alleged by CVC in the Amended Complaint is wholly conclusory. The Amended Complaint asserts that "Regal's monopoly over first-run films has resulted in higher box office prices and the elimination or restriction of discounts that competitive pressures engender." (Am. Compl. ¶ 50.) Taken alone, however, allegations of restricted price competition do not rebut the presumption that exclusive distributorships are legal under the antitrust laws; it is "well established that exclusive agreements do not harm competition when there is competition to obtain the exclusive contract." *Spinelli v. Nat'l Football League*, No. 13-cv-7398 (RWS), 2015 WL 1433370, at *26 (S.D.N.Y. Mar. 27, 2015); *cf. Harrison Aire, Inc. v. Aerostar Int'l, Inc.*, 423 F.3d 374, 381 (3d Cir. 2005) ("Competitive markets are characterized by both price and quality competition, and a firm's comparatively high price may simply reflect a superior product."). In any case, CVC alleges no facts to suggest that ticket prices would be lower and discounts more generous if the Cinemart and the Midway played the same first-run films at the same time. Similarly, the Amended Complaint baldly asserts that "Regal's conduct has . . . resulted in reduced total motion picture output." (Am. Compl. ¶ 51.) Yet CVC makes no attempt to allege facts showing that consumer demand in Forest Hills for the first-run films in question exceeds the Midway's supply, nor has it demonstrated how consumer choice is restricted when the two theaters play different rather than identical films. CVC altogether fails to articulate why the inability to show the same films at both the Midway and the Cinemart constitutes an unreasonable

11

restraint of trade. Instead, the Amended Complaint "relies on conclusions, without any supporting facts, that moviegoers have been harmed." *Starlight Cinemas v. Regal Entm't Grp.*, No. 14-cv-5463 (MLR), 2014 WL 7781018, at *2 (C.D. Cal. Oct. 23, 2014). But the picture it paints is one of routine business competition, not the kind of unreasonably restrictive schemes prohibited by federal antitrust law.

CVC's allegations of marketwide harm suffer from a further flaw, in that the Amended Complaint neglects to define the market adequately or consistently. *See Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219, 227 (2d Cir. 2006) (defining market requires alleging facts describing "the areas in which the seller operates and where consumers can turn, as a practical matter, for supply of the relevant product"). As noted earlier, the Amended Complaint designates the Forest Hills neighborhood of Queens, New York as the relevant geographic market (Am. Compl. ¶¶ 1, 22), and it offers facts to support a claim of restricted price competition in Forest Hills only (*id.* ¶¶ 57–58); yet it repeatedly slides into assertions of market harm to the entire borough of Queens (*see id.* ¶¶ 23, 51 57, 60(a)). At one point, it goes so far as to allege "injurious effects on *New York* commerce" as a whole. (*Id.* ¶ 60 (emphasis added).)

CVC cannot have it both ways. Either (1) *Forest Hills* is the relevant geographic market, in which case the Amended Complaint fails to explain why a single neighborhood in Queens is a cognizable geographic market, particularly when "Forest Hills is easily accessible by subway, rail, bus and car" (*id.* ¶ 23) to other neighborhoods with movie theaters, with which Regal presumably must compete for business (*see* Mem. 13 n.3 (noting inconsistent and inaccurate characterization of the relevant market)); or (2) *all of Queens* is the relevant geographic market, in which case the Amended Complaint simply asserts, without the support of any facts, that restricted price competition in Forest Hills actually harms the market for first-run films in Queens as a whole.

(*See* Am. Compl. ¶¶ 49, 57–58.)  While market definition is a "deeply fact-intensive inquiry," and courts hesitate to dismiss cases for failure to plead a relevant market, *Concord Assocs., L.P. v. Entm't Properties Trust*, 817 F.3d 46, 53 (2d Cir. 2016), dismissal is appropriate where, as here, a plaintiff has defined the relevant market in an inconsistent and facially implausible way, *see Chapman v. New York State Div. for Youth*, 546 F.3d 230, 238 (2d Cir. 2008) (proposed relevant market "legally insufficient and a motion to dismiss may be granted" where plaintiff "alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor"); *see also, e.g.*, *Concord Assocs.*, No. 12-cv-1667 (ER), 2014 WL 1396524, at *17 (S.D.N.Y. Apr. 9, 2014) (dismissing Section 1 claim where plaintiff "allege[d] no plausible fact explaining why other areas within convenient transit of the population center . . . should be excluded"), *aff'd*, 817 F.3d 46 (2d Cir. 2016).

For all these reasons, the Court alternatively concludes that the Amended Complaint does not adequately plead actual market harm sufficient to show an unreasonable restraint of trade, which is equally fatal to CVC's Section 1 claim.  Accordingly, since CVC has failed to state a claim under the Sherman Act, Count I of the Amended Complaint must be dismissed.

### B.  Donnelly Act Claim

The Court next turns to CVC's Donnelly Act claim.  New York's Donnelly Act prohibits "[e]very contract, agreement, arrangement or combination whereby . . . competition . . . may be restrained."  N.Y. Gen. Bus. Law § 340(1).  The Donnelly Act was "modelled on" the Sherman Act and therefore "should generally be construed in light of Federal precedent and given a different interpretation only where State policy, differences in the statutory language or the legislative history justify such a result."  *X.L.O. Concrete Corp. v. Rivergate Corp.*, 83 N.Y.2d 513, 518 (1994); *see also Williams v. Citigroup Inc.*, 659 F.3d 208, 211 n.2 (2d Cir. 2011) (observing that

Donnelly Act "was modeled on the Sherman Act and has generally been construed in accordance with federal precedents"); *Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*, 861 F. Supp. 2d 344, 370 (S.D.N.Y. 2012) ("The standard for a well-pleaded Donnelly Act claim is the same as a claim under Section 1 of the Sherman Act."). The Court sees no reason, and CVC has offered none, to depart from federal precedent construing the Sherman Act here. As a result, the Court finds that CVC has failed to state a claim under the Donnelly Act, and that Count II of the Amended Complaint must be dismissed for the same reasons discussed above in connection with Count I. *See In re Digital Music Antitrust Litig.*, 592 F. Supp. 2d 435, 447 n.18 (S.D.N.Y. 2008) (observing that "the substantive provisions of the Donnelly Act mirror federal antitrust law, and thus, any New York antitrust claims would be dismissed for the same reasons" as the federal antitrust claims), *vacated and remanded on other grounds*, *Starr v. Sony BMG Music Entm't*, 592 F.3d 314 (2d Cir. 2010); *Gatt Commc'ns, Inc. v. PMC Assocs., LLC*, 711 F.3d 68, 81–82 (2d Cir. 2013) (affirming dismissal of Donnelly Act claims on same grounds as Sherman Act claims); *Mooney v. AXA Advisors, LLC*, 19 F. Supp. 3d 486, 502 (S.D.N.Y. 2014) (dismissing Donnelly Act claim on same grounds as Sherman Act claim); *Reading Int'l, Inc. v. Oaktree Capital Mgmt. LLC*, No. 03-cv-1895 (PAC), 2007 WL 39301, at *18 (S.D.N.Y. Jan. 8, 2007) (granting summary judgment on Donnelly Act claims on same grounds as Sherman Act claims).

### C. Intentional Interference with Prospective Economic Advantage

The Court next turns to CVC's claim for intentional interference with prospective economic advantage. To plead intentional interference under New York law, a plaintiff must allege that "(1) it had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to

14

the relationship." *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 400 (2d Cir. 2006). With respect to the third element, "wrongful means" include "physical violence, fraud, misrepresentation, civil suits, criminal prosecutions and some degrees of economic pressure; they do not, however, include persuasion alone although it is knowingly directed at interference with the [prospective] contract." *Scutti Enters., LLC v. Park Place Entm't Corp.*, 322 F.3d 211, 216 (2d Cir. 2003) (quoting *NBT Bancorp Inc. v. Fleet/Norstar Fin. Grp., Inc.*, 87 N.Y.2d 614, 624 (1996)). Regal argues that the Amended Complaint fails to adequately allege the third element. The Court agrees.

The Amended Complaint makes a halfhearted stab at pleading the "wrongful means" element by referring back to "Regal's intentional anticompetitive conduct as alleged herein [under CVC's Sherman Act and Donnelly Act claims]." (Am. Compl. ¶ 73.) While antitrust violations can constitute "wrongful means" for purposes of intentional interference claims, *see Reading Int'l, Inc. v. Oaktree Capital Mgmt., LLC*, 317 F. Supp. 2d 301, 334 (S.D.N.Y. 2003), the Court has already found that the Amended Complaint does not state a valid antitrust claim under either the Sherman Act or the Donnelly Act, as discussed above. Thus, to the extent CVC relies on its antitrust claims to establish the third element of its intentional interference claim, its Amended Complaint fails to allege "wrongful means," and so fails to state a cognizable claim for intentional interference with prospective economic advantage.

CVC alleges no additional facts to show that Regal used "wrongful means" in its dealings with the film distributors. The Amended Complaint once again resorts to bald and conclusory assertions: Regal "acted . . . with intent to injure Cinemart . . . and to gain a wrongful competitive advantage over Cinemart" (Am. Compl. ¶ 73); Regal "acted willfully, maliciously, oppressively" (*id.* ¶ 76); Regal's conduct was "fraudulent, willful, and malicious" (*id.*). But nowhere does the Amended Complaint include facts to support any of these charges. Certainly nothing alleged in

15

the Amended Complaint allows the Court to plausibly infer that Regal engaged in the kind of seriously wrongful conduct contemplated by the third element of this cause of action. *See Enzo Biochem, Inc. v. Molecular Probes, Inc.*, No. 03-cv-3816 (RJS), 2013 WL 6987615, at *3 (S.D.N.Y. Dec. 6, 2013) (stressing that this element "represents a particularly high hurdle, for it requires a plaintiff to show that the defendant committed a crime or an independent tort [such as fraud], or [acted] for the sole purpose of inflicting intentional harm on the plaintiff" (internal quotation marks omitted)). Accordingly, the Court finds that CVC has failed to state a claim for intentional interference with prospective economic advantage under New York law, and Count III of the Amended Complaint must also be dismissed.

### D. Leave to Amend

CVC has requested leave to amend its Amended Complaint in the event of dismissal. (Opp'n at 20–21.) Although "Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to amend 'shall be freely given when justice so requires,' it is within the sound discretion of the [Court] to grant or deny leave to amend." *McCarty v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007) (quoting Fed. R. Civ. P. 15(a)). The Second Circuit has consistently held that district courts may deny leave to amend when a plaintiff requests such leave in a cursory sentence on the last page of an opposition to a motion to dismiss, without offering any justification or attaching a proposed amended pleading. *See, e.g.*, *Food Holdings Ltd. v. Bank of Am. Corp.*, 423 F. App'x 73, 76 (2d Cir. 2011) (affirming district court's denial of leave to amend where plaintiff requested leave "on the final page of their brief in opposition to defendants' motion to dismiss, in boilerplate language and without any explanation as to why leave to amend was warranted"); *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 188 (2d Cir. 2014) (affirming district court's denial of leave to amend where plaintiffs had already had one

16

opportunity to amend their complaint and they "identified no additional facts or legal theories" to support their request to amend); *Horoshko v. Citibank, N.A.*, 373 F.3d 248, 249 (2d Cir. 2004) (observing that a district court is under "no obligation" to grant leave to amend when the plaintiff offers merely "conclusory assertion[s]" that amendment would cure a complaint's deficiencies and "fail[s] to disclose what additional allegations [he] would make which might lead to a different result").

CVC here makes its request for leave to amend in a single sentence on the last page of its opposition to Regal's motion to dismiss. (Opp'n at 21 ("[I]f the Court finds that CVC has failed to allege facts sufficient to sustain its causes of action, CVC respectfully requests the opportunity to amend.").) CVC offers no basis for its request and does not attach a proposed amended complaint. *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015) (noting that a court may deny leave to amend, on notice grounds, "where the request gives no clue as to how the complaint's defects would be cured"). Nor is this CVC's first attempt at re-pleading in this action. CVC sought and received leave to amend on October 8, 2015 (*see* Doc. Nos. 19, 22) in order to allege facts with greater clarity and specificity (*see* Oct. 8, 2015 Hr'g Tr. at 11–14, 20, 27 (Doc. No. 27)). Notwithstanding that opportunity to file amended pleadings, CVC still relies on vague and conclusory allegations that are inadequate to sustain its asserted causes of action.

"While pleading is not a game of skill in which one misstep may be decisive to the outcome, neither is it an interactive game in which plaintiffs file a complaint, and then bat it back and forth with the Court over a rhetorical net until a viable complaint emerges." *In re Refco Capital Mkts., Ltd. Brokerage Customer Sec. Litig.*, Nos. 06-cv-643, 07-cv-8686, 07-cv-8688 (GEL), 2008 WL 4962985, at *2 (S.D.N.Y. Nov. 20, 2008); *see also Ruotolo v. City of New York*, 514 F.3d 184, 191

(2d Cir. 2008) (noting that courts can deny leave to amend where there has been "repeated failure to cure deficiencies by amendments previously allowed"); *NRW, Inc. v. Bindra*, No. 12-cv-8555 (RJS), 2015 WL 3763852, at *1 (S.D.N.Y. June 16, 2015) ("To grant leave to amend after a plaintiff has had ample opportunity to amend would be condoning a strategy whereby plaintiffs hedge their bets . . . in the hopes of having another bite at the proverbial apple."). Accordingly, because CVC has failed to provide any explanation for why an additional opportunity to amend would cure the Amended Complaint's deficiencies, and because CVC's past attempt provides no confidence in this regard, the Court denies CVC's request for leave to amend.

## IV. CONCLUSION

For the reasons stated above, IT IS HEREBY ORDERED THAT Defendant's motion to dismiss is GRANTED with respect to all three of Plaintiff's claims. The Clerk of the Court is respectfully directed to terminate the motion located at docket number 34 and to close this case.

SO ORDERED.

Dated:     September 29, 2016
           New York, New York

RICHARD J. SULLIVAN
United States District Judge

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/29/16